1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                   **EASTERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  BERNARDO COLON, | Case No. 1:11-cv-01420-LJO-BAM-HC |
| 12       Petitioner, | ORDER SUBSTITUTING DANIEL PARAMO, WARDEN, AS RESPONDENT |
| 13 | |
| 14    v. | FINDINGS AND RECOMMENDATIONS TO DISMISS PETITIONER'S STATE LAW CLAIM AND DENY THE PETITION FOR WRIT OF HABEAS CORPUS (DOC. 1) |
| 15 | |
| 16 | FINDINGS AND RECOMMENDATIONS TO DIRECT THE ENTRY OF JUDGMENT FOR RESPONDENT AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY |
| 17  DANIEL PARAMO, Warden, | |
| 18       Respondent., | |
| 19 | **OBJECTIONS DEADLINE:** **THIRTY (30) DAYS AFTER SERVICE** |

20
21
22       Petitioner is a state prisoner proceeding pro se and in forma

pauperis with a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254.  The matter has been referred to the Magistrate Judge

pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 through 304.

Pending before the Court is the petition, which was filed on July 6,

2011.  Respondent filed an answer on October 24, 2011, and

Petitioner filed a traverse on November 16, 2011.

1

I.   Jurisdiction and Substitution of Respondent

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

The challenged judgment was rendered by the Superior Court of the State of California, County of Kern (KCSC), which is located within the territorial jurisdiction of this Court.  28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d).  Further, Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his constitutional rights.  Accordingly, the Court concludes that it has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 2254(a) and 2241(c)(3), which authorize a district court to entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. B, -, 131 S.Ct. 13, 16 (2010) (per curiam).

An answer was filed on behalf of Respondent Brenda M. Cash, who, pursuant to the judgment, had custody of Petitioner at the California State Prison at Los Angeles County, his institution of confinement at the time the petition and answer were filed.  (Doc. 16.)  Petitioner thus named as a respondent a person who had custody of Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules).  See, Stanley v. California Supreme Court, 21 F.3d

359, 360 (9th Cir. 1994). The fact that Petitioner was transferred to the R. J. Donovan Correctional Facility (RJDCF) after the petition was filed does not affect this Court's jurisdiction; jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change. Francis v. Rison, 894 F.2d 353, 354 (9th Cir. 1990) (citing Smith v. Campbell, 450 F.2d 829, 834 (9th Cir. 1971)).

Accordingly, the Court concludes that it has jurisdiction over the person of the Respondent.

However, in view of the fact that the warden at RJDCF is Daniel Paramo, it is ORDERED that Daniel Paramo, Warden of RJDCF, be SUBSTITUTED as Respondent pursuant to Fed. R. Civ. P. 25.[1]

II.  Procedural Summary

After a jury trial in the KCSC, Petitioner was convicted on January 10, 2008, of having possessed phencyclidine in 2006 in violation of Cal. Health & Saf. Code § 11377(a), misdemeanor driving with a suspended license with three prior convictions within five years of the commission of the offense in violation of Cal. Veh. Code § 14601.1(a) & (b)(2), and misdemeanor attempt to elude a peace officer in violation of Cal. Veh. Code § 2800.1. The KCSC found true allegations that Petitioner had suffered two prior serious felony convictions pursuant to Cal. Pen. Code §§ 667 and 1170.12.

---

[1] Fed. R. Civ. P. 25(d) provides that when a public officer who is a party to a civil action in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party. It further provides that the Court may order substitution at any time, but the absence of such an order does not affect the substitution.

1   (LD 1, 793-95, 37-40, 918.)[2]   Petitioner was sentenced on October 9,

2   2008, to twenty-five years to life for the drug possession and two

3   concurrent six-month jail terms on the vehicular offenses after the

4   court denied Petitioner's request that his two prior serious felony

5   convictions be stricken.   (Id. at 893-903, 915-19.)

6       The Court of Appeal of the State of California, Fifth Appellate

7   District (CCA) affirmed the judgment on February 22, 2010.   (Ans.,

8   exh. A, doc. 16-1, 1-46.)

9       The California Supreme Court denied Petitioner's petition for

10   review on May 12, 2010.   (LD 8.)

11       III.   <u>Factual Summary</u>

12       In a habeas proceeding brought by a person in custody pursuant

13   to a judgment of a state court, a determination of a factual issue

14   made by a state court shall be presumed to be correct; the

15   petitioner has the burden of producing clear and convincing evidence

16   to rebut the presumption of correctness.   28 U.S.C. § 2254(e)(1);

17   <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48 (9th Cir. 2004).   This

18   presumption applies to a statement of facts drawn from a state

19   appellate court's decision.   <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1

20   (9th Cir. 2009).   The following factual summary, which omits data

21   concerning the testimony of a criminalist that identified the

22   substance as phencyclidine, is taken from the unpublished opinion of

23   the CCA in <u>The People v. Bernardo Colon</u>, case number F056334, filed

24   on February 22, 2010 (doc. 16-1, 2-4, 7-8):

25                         <u>FACTS</u>

26       Around 9:50 p.m. on March 12, 2006, Bakersfield Police
        Officers Dillard and Carruesco were on patrol in a marked

27

28  

---

[2] "LD" refers to documents lodged by Respondent in support of the answer.

4

squad car on Kentucky Street when they saw a Dodge Neon traveling in the opposite direction. The officers were aware that a Dodge Neon recently had been reported stolen, so Carruesco performed a U-turn and followed the car. The Dodge, which was driven by defendant, made several turns and the officers continued to follow it. The speed limit was 25 miles per hour, but the officers paced defendant's car at 35 miles per hour. Defendant accelerated away from the patrol car. The officers activated the patrol car's siren and flashing lights to conduct a traffic stop, but defendant did not pull over.

A brief pursuit ensued for about one mile, as defendant made numerous turns, violated several traffic laws, and accelerated to 45 miles per hour. Defendant was driving on streets which would have easily allowed him to pull to the side of the road, but he failed to heed the patrol car's siren and flashing lights. The pursuit lasted one to two minutes, and ended when defendant turned into a residential area, slowed down, and parked in front of the apartment complex where he lived.

The officers used the patrol car's loudspeaker to order the occupants out of the vehicle. Defendant and two passengers complied with the officers' orders and stepped out of the car. Defendant was immediately taken into custody. A woman emerged from the residence and introduced herself as defendant's wife.

The officers determined the Dodge was not stolen but that defendant was driving on a suspended or revoked license. Officer Dillard advised defendant of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, defendant said he understood and waived his rights, and Dillard asked defendant why he failed to pull over when the officers initiated the siren and lights. Defendant replied that he did not know the officers were trying to pull him over, and he just thought they were trying to go around him. Dillard asked: "[S]o when we first turned on our lights and sirens ... you didn't think we were trying to pull you over?" Defendant did not reply.

Officer Carruesco searched defendant and found a small piece of a plastic baggie in defendant's right front pants pocket. The baggie contained a white crystalline-like substance about "the size of a pencil eraser, not much bigger." Carruesco believed the substance was crystal

5

methamphetamine, which is similar in appearance to PCP. On
cross-examination, Carruesco reviewed his report and
conceded he might have found the substance in the smaller
coin pocket of defendant's pants and not the regular
pocket. Also on cross-examination, Carruesco acknowledged
he did not find any drug paraphernalia on defendant or in
the car.

....

**Defense evidence**

Cecilia Sandoval testified she lived with defendant.
Sandoval testified that on the night of the incident,
defendant returned from work, took a shower, and wore a
pair of pants which he had just purchased from the
Goodwill store on Union Avenue. Sandoval testified
defendant had not laundered or worn those pants prior to
that evening. Sandoval testified that later in the
evening, defendant's coworkers arrived at their residence
to get paid. Defendant and his friends left for the bank,
and defendant intended to withdraw cash from the ATM to
pay them.

The defense introduced evidence as to the police
department's dispatch records of the pursuit of defendant,
and that the attempted traffic stop began at 9:50 p.m. and
the patrol units were cleared at 9:51 p.m., which meant
the pursuit ended at that time. A defense investigator
testified as to defendant's route while the officers
followed him, and testified that defendant traveled a
short distance between the beginning of the pursuit and
when he arrived at his residence.

The defendant also introduced evidence about an unrelated
incident to question Officer Carruesco's credibility. The
incident occurred when Carruesco was on patrol at the Kern
County Fair. Eric Barefield, an African-American,
testified that he was just walking through the fair when
Carruesco physically grabbed him, improperly escorted him
out of the fair, and used a racial slur against him. In
rebuttal, the prosecutor recalled the defense
investigator, who testified that he interviewed Barefield
about the incident at the fair, and Barefield was unable
to identify the officer who made the racial slur. The
prosecutor also recalled Officer Carruesco, who testified
that Barefield was part of a larger group which was
blocking foot-traffic at the fair. Carruesco and his

6

partner tried to break up the group, Barefield became
argumentative, and his partner decided to remove Barefield
from the fair. Carruesco testified that neither he nor his
partner called Barefield any names, and Carruesco was not
reprimanded for the incident.

(Doc. 16-1 at 2-4, 7-8; 2010 WL 612245, *1-*2, *4 (No. 056334, Feb. 22, 2010)).

III. Standard of Decision and Scope of Review

In his petition, Petitioner raises the following claims: 1) his right to confront witnesses protected by the Sixth and Fourteenth Amendments was violated by the failure of the prosecution to provide the testimony of the criminalist who actually performed the analyses of the substance found in Petitioner's pocket; 2) Petitioner's counsel was ineffective for failing to object to the introduction of the testimony of a supervising criminalist as a violation of Petitioner's right of confrontation; 3) Petitioner's sentence violated the Eighth and Fourteenth Amendments' protection against cruel and unusual punishment; and 4) the state sentencing court abused its discretion when it failed to strike Petitioner's prior convictions.

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on
behalf of a person in custody pursuant to the
judgment of a State court shall not be granted
with respect to any claim that was adjudicated
on the merits in State court proceedings unless
the adjudication of the claim—

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly
established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light

7

of the evidence presented in the State court
proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. at 405-06. The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002). A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407. An application of clearly established federal law is unreasonable only if it is

8

objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable. Williams, 529 U.S. at 410. A state court's determination that a claim lacks merit precludes federal habeas relief as long as it is possible that fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. Id. In order to obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. Cullen v. Pinholster, 131 S.Ct. at 1398. Further, habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA. Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v.

9

Pinholster, 131 S.Ct. at 1398.  Evidence introduced in federal court

has no bearing on review pursuant to § 2254(d)(1).  Id. at 1400.

Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding

brought by a person in custody pursuant to a judgment of a state

court, a determination of a factual issue made by a state court

shall be presumed to be correct; the petitioner has the burden of

producing clear and convincing evidence to rebut the presumption of

correctness.  A state court decision that was on the merits and was

based on a factual determination will not be overturned on factual

grounds unless it was objectively unreasonable in light of the

evidence presented in the state proceedings.  Miller-El v. Cockrell,

537 U.S. 322, 340 (2003).

     With respect to each claim, the last reasoned decision must be

identified in order to analyze the state court decision pursuant to

28 U.S.C. § 2254(d)(1).  Barker v. Fleming, 423 F.3d 1085, 1092 n.3

(9th Cir. 2005); Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir.

2003).

     IV.  Petitioner's Right to Confront Witnesses

     Petitioner argues that his Sixth and Fourteenth Amendment right

to confront witnesses was violated when with respect to the drug

testing process used on the substance found in Petitioner's pocket.

The prosecution produced the testimony of Jeanne Spencer, the

supervisor of the operations of the drug testing unit who reviewed

the testing.  The prosecution failed to present the testimony of

10

Allison Kennedy, the criminalist who actually performed the tests that indicated that the substance was phencyclidine.

Here, the CCA's decision was the last reasoned decision in which the state court adjudicated Petitioner's claims on the merits. Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This Court will thus "look through" the unexplained decision of the California Supreme Court to the CCA's last reasoned decision as the relevant state-court determination. Id. at 803-04; Taylor v. Maddox, 366 F.3d 992, 998 n.5 (9th Cir. 2004).

> A.   The State Court's Decision

The pertinent portions of the CCA's decision is as follows:

**The criminalist's trial testimony**

At trial, the prosecution introduced evidence that the white crystalline-like substance found in defendant's pocket contained PCP, based on the testimony of Jeanne Spencer, the lead criminalist for the drug section of the major crimes unit at the Kern County Regional Crime Laboratory, who supervised the daily operations of the drug section.

Spencer testified extensively about the policies and procedures followed by members of the laboratory to test items for controlled substances. Spencer had personally conducted over one hundred tests to determine if substances consisted of phencyclidine (PCP). Spencer testified the specific testing procedures followed by the criminalists in Kern County's crime laboratory are standard in the industry. The testing criminalist will open the sealed evidence envelope received from law

enforcement, weigh the material, conduct a color test for
PCP, and then confirm the results with the micro-
crystalline test. The testing criminalist might also
conduct an instrument analysis with a gas chromatograph
spectrometer. Spencer testified the testing criminalist
will make notes as to each stage of the analysis, and
explained it was part of laboratory policy to "document
basically everything we do."

Spencer supervised the daily operations in the
laboratory's drug section, and testified Allison Kennedy,
another criminalist in the same unit, conducted tests on
the substance found in defendant's pocket to determine if
it was a controlled substance.FN2 Spencer testified that
Kennedy took notes about her analysis of the substance and
prepared a report about the results. Spencer reviewed
Kennedy's notes and report, and testified there was no
indication that anything unusual occurred during the
analysis.

> FN2. In issue I, post, we will discuss
> defendant's contentions that the prosecution's
> introduction of evidence about the test results
> for the contraband through Spencer's testimony,
> and the failure to call Kennedy, the testing
> criminalist, violated his Sixth Amendment right
> to confront and cross-examine witnesses.

At this point in Spencer's testimony, the prosecutor asked
the court to admit Kennedy's notes and report through
Spencer's testimony, pursuant to the official records
exception to the hearsay rule (Evid. Code, § 1280). The
court asked defense counsel if she would submit the
matter. Defense counsel declined to submit to the
admission of the documents until she heard the rest of
Spencer's testimony. The court reserved ruling on the
prosecutor's motion and the prosecutor continued with
Spencer's direct examination.

Spencer testified that according to Kennedy's notes and
report, the substance seized from defendant's pocket
contained PCP. Spencer reviewed Kennedy's notes which
confirmed the chain of custody, that the item being tested
was the material seized from defendant's pocket. Spencer
testified that Kennedy performed color screening tests
which showed the substance contained PCP, and then
conducted two micro-crystalline tests which confirmed the

presence of PCP, all of which were consistent with the laboratory's protocol. Kennedy's notes and report stated the substance and packaging seized from defendant's pocket weighed 0.20 grams, the substance itself weighed 0.1982 grams, and a portion of the substance contained PCP. Spencer testified the substance was a usable amount that could be handled and manipulated, and it did not simply consist of residue on a baggie. Spencer testified that a photograph was taken of the item of evidence which Kennedy tested.

On cross-examination, defense counsel asked Spencer whether she tested the substance herself or supervised Kennedy's work. Spencer testified she did not oversee Kennedy's tests, and she did not perform additional tests or analysis of the item found in defendant's pocket. Defense counsel asked if there was any material left to conduct another analysis. Spencer testified there was "plenty of material left to be re-analyzed," and the remaining amount was returned to the Bakersfield Police Department.

Defense counsel asked Spencer whether the substance consisted of a usable amount of a controlled substance. Spencer explained that a useable amount meant whether the substance had the potential for use or sales.

> "[Defense counsel] The analysis of this particular item tells you that there is a weight of .1982 grams of a substance and a portion there of it contains phencyclidine. Is that right?

> "A. That's correct.

> "Q. So not everything according to this analysis that's contained in the .1982 grams is in fact phencyclidine?

> "A. That's correct."

On redirect examination, the prosecutor asked Spencer about Kennedy's training and qualifications. Spencer testified that Kennedy joined the crime laboratory in 1999, she finished her training in 2003, and she had been conducting tests on controlled substances since that time. Spencer again testified that she did not conduct the tests

on the substance, but explained that she was responsible for conducting both the technical and administrative reviews of Kennedy's tests in this case, and Kennedy's work passed the two-step review process. In the technical review, Spencer examined all of the data "to make sure it supports the conclusion that was reached. Then administratively I look to see if all the laboratory policies and procedures and protocols were followed, things like that."

At the conclusion of Spencer's testimony, the prosecutor moved all the exhibits into evidence, including Kennedy's notes and report. Defense counsel did not object and submitted the matter, and the court admitted the exhibits into evidence.

....

## DISCUSSION

## I. **Admission of the Criminalist's Report**

Defendant contends the prosecution's evidence that the substance in his pocket contained PCP was testimonial within the meaning of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), and his Sixth Amendment rights were violated because Spencer, the supervising criminalist who testified in this case, did not conduct the tests on the substance, and Kennedy, the testing criminalist, did not testify at trial and was not available for cross-examination.

### A. *Crawford, Geier, and Melendez-Diaz*

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." (U.S. Const., amend.VI.) The admission of an unavailable witness's out-of-court statements against a criminal defendant was previously governed by *Ohio v. Roberts* (1980) 448 U.S. 56 (*Roberts*), which held that such statements could be admitted consistent with the confrontation clause only when the evidence fell within "a firmly rooted hearsay exception," or the statements contained "particularized guarantees of trustworthiness" such that adversarial testing would add little to the statements' reliability. (*Id.* at p. 66.)

In *Crawford v. Washington, supra*, 541 U.S. 36 (*Crawford*), the United States Supreme Court repudiated *Roberts* and held testimonial out-of-court statements offered against a criminal defendant are inadmissible under the Sixth Amendment unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id.* at pp. 59, 68.) Where nontestimonial hearsay is at issue, evidence is exempt "from Confrontation Clause scrutiny altogether" and may be admitted pursuant to the hearsay law. (*Id.* at p. 68.)

*Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" but held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford, supra*, 541 U.S. at p. 68.) FN4

> FN4. The erroneous admission of statements in violation of a defendant's Sixth Amendment rights is subject to a harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.)

In *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), the court expanded upon *Crawford* and offered the following explanation of testimonial statements under the Sixth Amendment:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, 547 U.S. at p. 822.)

15

*Davis* relied upon and applied these distinctions to two factual situations to determine "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." (*Davis, supra*, 547 U.S. at p. 817.) *Davis* held the tape recording of a domestic disturbance victim's telephone call to a 911 operator was admissible and not testimonial under *Crawford*, even though the 911 operator asked the victim questions about the incident, because a 911 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis, supra,* 547 U.S. at pp. 827, 817-819.) The victim on the 911 call was "speaking about events *as they were actually happening*, rather than 'describ[ing] past events' ... [citation]." (*Id.* at p. 827, italics in original.) In contrast, *Davis* held that in the companion case, a domestic violence victim's statements to police officers, given in the course of their investigation, were testimonial and inadmissible in the absence of the victim's trial testimony, because the victim spoke to officers about the assault after the incident happened, she gave her statements to the officers as part of an investigation into possible past criminal conduct, there was no emergency in progress, and no immediate threat to the victim. (*Id.* at pp. 829-830, 819-821.)

In *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*), the California Supreme Court held an expert could testify about the results of DNA tests, even if that expert did not conduct the actual tests, without violating *Crawford* and the defendant's Sixth Amendment rights. The prosecution's expert in *Geier* was the laboratory director for an accredited private laboratory that performed DNA tests for both the prosecution and defense, and the director reviewed the work performed by the analyst who conducted the actual tests. Defendant objected to the expert's testimony and argued the evidence violated his Sixth Amendment rights because the expert did not conduct the tests. (*Geier, supra*, 41 Cal.4th at pp. 593-596.)

*Geier* reviewed *Crawford* and *Davis* as to the determination of whether a statement is testimonial under the Sixth Amendment and held: "[W]hat we extract from those decisions is that a statement is testimonial if (1) it is made to a law enforcement officer or by or to a law

16

enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial." (*Geier, supra*, 41 Cal.4th at p. 605.)

Based on this interpretation, *Geier* held the circumstances under which the testing analyst prepared the DNA report meant such evidence was not testimonial under *Crawford* and *Davis*. (*Geier, supra*, 41 Cal.4th at p. 607.) *Geier* held the report was not testimonial because it contained the analyst's observations as she actually performed the tests and thus constituted "a contemporaneous recordation of observable events rather than the documentation of past events." (*Id.* at p. 605, italics added.) *Geier* acknowledged the DNA report was requested by a police agency and the laboratory's employees were paid for their work as part of a government investigation. (*Ibid.*) However, *Geier* held "'the proper focus [about whether an out-of-court statement is testimonial] is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial.' [Citations.]" (*Ibid.*)

> "In our view, under *Davis*, determining whether a statement is testimonial requires us to consider the circumstances under which the statement was made. As we read *Davis,* the crucial point is *whether the statement represents the contemporaneous recordation of observable events.*" (*Id.* at p. 607, italics added.)

*Geier* held the analyst's notes were admissible because they "were made 'during a routine, non-adversarial process meant to ensure accurate analysis.' [Citations.] In simply following [the laboratory's] protocol of noting carefully each step of the DNA analysis, recording what she did with each sample received, [the analyst] did not 'bear witness' against defendant. [Citation.] Records of laboratory protocols followed and the resulting raw data acquired are not accusatory. 'Instead, they are neutral, having the power to exonerate as well as convict.' [Citation.]" (*Geier, supra*, 41 Cal.4th at p. 607.) In the alternative, *Geier* held that even if the testifying expert's reliance on the DNA report violated defendant's Sixth Amendment rights, any error was harmless given other evidence which clearly connected defendant to the crime. (*Id.* at p. 608.)

17

In *Melendez-Diaz v. Massachusetts* (2009) --- U.S. ----
[129 S .Ct. 2527] (*Melendez-Diaz*), a case decided after
defendant was convicted but while the instant appeal was
pending, the United States Supreme Court held that
documentary evidence stating that certain contraband
tested positive for cocaine constituted "testimonial"
evidence, and was inadmissible in the absence of the trial
testimony of the analysts who performed such tests,
pursuant to the Confrontation Clause of the Sixth
Amendment. (*Id.* at p. 2532.) The petitioner was found in
possession of bags containing a substance that resembled
cocaine. (*Id.* at p. 2530.) The prosecution introduced
three notarized "'certificates of analysis'" which showed
the results of forensic analysis performed on the seized
substances. The certificates reported the weight of the
seized bags, and that the substances were examined and
found to contain cocaine. The certificates complied with
state law and were sworn to before a notary public by
analysts from the state's crime laboratory, but no
analysts testified at trial. (*Id.* at p. 2530-2531.) The
petitioner objected to the certificates and argued the
evidence was testimonial and violated his Sixth Amendment
rights under *Crawford*, but the trial court overruled the
objection and held the analysts who tested the contraband
were not required to appear at trial. (*Id.* at p. 2531.)

*Melendez-Diaz* held the admission of the certificates, in
the absence of the trial testimony of the analysts who
tested the contraband, violated petitioner's Sixth
Amendment rights because there was "little doubt" the
certificates fell "within the 'core class of testimonial
statements'" subject to the Sixth Amendment restrictions
described in *Crawford*. (*Melendez-Diaz, supra*, 129 S.Ct. at
p. 2532.) "The 'certificates' are functionally identical
to live, in-court testimony, doing 'precisely what a
witness does on direct examination.' [Citation.]" (*Ibid.)*
While state law described the documents as
"'certificates,'" *Melendez-Diaz* held they were "quite
plainly affidavits" and "'"made under circumstances which
would lead an objective witness reasonably to believe that
the statement would be available for use at a later
trial."' [Citation.]" (*Ibid.*) Moreover, the "*sole purpose*"
of the affidavits under state law "was to provide 'prima
facie evidence of the composition, quality, and the net
weight' of the analyzed substance [citation]." (*Ibid.*,
italics in original.)

18

*Melendez-Diaz* noted that its decision "involved little more than the application of our holding in *Crawford*." (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2542.) "In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to '"be confronted with"' the analysts at trial. [Citation.]" (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2532, italics in original.) *Melendez-Diaz* noted the affidavits submitted by the analysts "contained only the bare-bones statement that '[t]he substance was found to contain: Cocaine.' [Citations.] At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." (*Melendez-Diaz, supra*, 129 S.Ct. at pp. 2537-2538.)

*Melendez-Diaz* maintained that it was not holding that "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case," or that "everyone who laid hands on the evidence must be called." (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2532, fn. 1.) The court explained that "'gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.' It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony is introduced must (*if the defendant objects*) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records. [Citation.]" (*Ibid.*, first italics in original, second italics added.)

Justice Scalia's plurality opinion in *Melendez-Diaz* was joined by three other justices. Justice Thomas filed a short concurring opinion, which stated that he joined the court's opinion "because the documents at issue in this case 'are quite plainly affidavits,' [citation]. As such, they 'fall within the core class of testimonial statements' governed by the Confrontation Clause.

19

[Citation.]" (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2543 (conc. opn. of Thomas, J.), italics added.) FN5

> FN5. The four dissenting justices in *Melendez-Diaz* complained the majority swept away "an accepted rule governing the admission of scientific evidence" that had been in existence for at least 90 years, whereas *Crawford* and *Davis* said "nothing about forensic analysts...." (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2543 (dis. opn. of Kennedy, J.).) The dissent concluded that Crawford's definition of testimonial evidence should be limited to "conventional" witnesses who have "personal knowledge of some aspect of the defendant's guilt...." (*Ibid.*)

At the time the United States Supreme Court decided *Melendez-Diaz*, a petition for writ of certiorari in *Geier* was pending before the court. The court denied certiorari in *Geier*, without comment, four days after deciding *Melendez-Diaz* . (*Geier v. California* (2009) --- U.S. ---- [129 S.Ct. 2856].)

On the same day the court denied certiorari in *Geier*, it granted review in another case which involved a similar issue, *Magruder v. Commonwealth* (2008) 275 Va. 283 [657 S.E.2d 113], cert. granted *sub. nom. Briscoe v. Virginia* (2009) --- U.S. ---- [129 S.Ct. 2858].) In that case, the Virginia Supreme Court held a defendant's Sixth Amendment rights were protected under a statutory procedure which allowed the prosecution to introduce certificates of analysis as to the results of laboratory tests performed on contraband, and also provided the defendant with the right to call the forensic analyst as an adverse witness to testify about the results. The Virginia Supreme Court held such a procedure allowed the defendant to confront and cross-examine the forensic analyst, and further held the defendant's failure to call the analyst as an adverse witness resulted in a waiver of any Sixth Amendment objection under *Crawford*. (*Magruder v. Commonwealth, supra*, 275 Va. at pp. 295, 297-302, 304-305 [657 S.E.2d at pp. 119, 120-123, 124-125].)

In January 2010, the United States Supreme Court heard oral argument in the case but just two weeks later, it summarily vacated the judgment of the Virginia Supreme

Court and remanded the matter "for further proceedings not inconsistent with the opinion" in *Melendez-Diaz*, without issuing an opinion. (*Briscoe v. Virginia* (2010) No. 07-11191 --- U.S. ---- [--- S.Ct. ----, 2010 U .S. Lexis 767 [2010 WL 246152]].)

B. **Competing views of *Melendez-Diaz***

The potential conflict between *Melendez-Diaz* and *Geier* is pending before the California Supreme Court, which has granted petitions for review in a series of appellate decisions which reached different conclusions on the issue. (See *People v. Rutterschmidt* (2009) 176 Cal.App.4th 1047 [98 Cal.Rptr.3d 390] review granted Dec. 2, 2009, S176213 [*Melendez-Diaz* did not overrule *Geier*]; *People v. Gutierrez* (2009) 177 Cal.App.4th 654 [99 Cal.Rptr.3d 369] review granted Dec. 2, 2009, S176620 [*Melendez-Diaz* did not overrule *Geier*]; cf. *People v. Lopez* (2009) 177 Cal.App.4th 202 [98 Cal.Rptr.3d 825] review granted Dec. 2, 2009, S177046 [*Melendez-Diaz* overruled *Geier*]; *People v. Dungo* (2009) 176 Cal.App.4th 1388 [98 Cal.Rptr.3d 702] review granted Dec. 2, 2009, S176886 [*Melendez-Diaz* overruled *Geier*].)

One of the cases currently pending before the California Supreme Court is particularly noteworthy because of the court's limited grant of review. In *People v. Rutterschmidt, supra*, 98 Cal.Rptr .3d 390, the Second District, Division 5, addressed contentions raised by two codefendants, Rutterschmidt and Golay, as to whether *Melendez-Diaz* overruled *Geier*. *Melendez-Diaz* had not been decided at the time of the defendants' joint jury trial. The trial court admitted the testimony of a toxicology expert about tests conducted on a homicide victim, but that expert did not conduct the actual tests. At trial, Golay raised a Sixth Amendment objection but Rutterschmidt did not object.

On appeal, both defendants argued the expert's testimony violated the Sixth Amendment and *Melendez-Diaz*, which was decided after defendants were convicted. The court held one defendant, Rutterschmidt, failed to preserve the Sixth Amendment issue for appellate review because she did not raise a confrontation clause objection to the evidence during trial, whereas the defendant in *Melendez-Diaz* raised a timely Sixth Amendment objection the introduction of the certificates in that case. In addition, the court

found there were no extraordinary circumstances to excuse Rutterschmidt's failure to raise a confrontation clause objection at trial, and declined to address her Sixth Amendment contentions on appeal. (*People v. Rutterschmidt,* supra, 98 Cal.Rptr.3d 390 at pp. 408, 410, 412 & fn. 13.) The court also rejected defendant Rutterschmidt's belated attempt to argue that defense counsel was ineffective for failing to object, because she did not raise the ineffective assistance claim in her opening brief on appeal and only raised it for the first time in her reply brief. (*Id.* at p. 410 & fn. 12.) In contrast, the court held that codefendant Golay preserved the *Melendez-Diaz* issue for appellate review because she made a Sixth Amendment objection when the toxicology evidence was introduced at trial. The court ultimately held that *Melendez-Diaz* did not overrule *Geier.*

Both defendants in *Rutterschmidt* filed petitions for review and argued *Melendez-Diaz* overruled *Geier.* The California Supreme Court granted defendant Golay's petition for review on the Sixth Amendment issue. However, the court denied without comment the petition for review filed by codefendant Rutterschmidt, who had failed to make a Sixth Amendment objection at trial or a timely ineffective assistance argument on appeal. (*People v. Rutterschmidt, supra*, 98 Cal.Rptr.3d 390.)

C. **Analysis.**

Defendant contends that as in *Melendez-Diaz*, his Sixth Amendment rights were violated in this case because the prosecution's evidence that the substance in his pocket contained PCP was testimonial, the testifying criminalist, Spencer, did not conduct the actual tests, and the testing criminalist, Kennedy, was not called as a witness and was not subject to cross-examination.

We reject defendant's contentions for three reasons: defense counsel failed to object and waived review of the Sixth Amendment issue, counsel's failure to object was based on a tactical decision, and, even if the issue was preserved for review, the evidence was properly admitted.

   *Waiver*

It is undisputed that defendant failed to raise a Sixth Amendment objection to the criminalist's trial testimony.

22

"'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' [Citation.]" (*U.S. v. Olano* (1993) 507 U.S. 725, 731.) A claim that the introduction of evidence violated the defendant's rights under the confrontation clause must be timely asserted at trial or it is waived on appeal. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19; *People v. Burgener* (2003) 29 Cal.4th 833, 869; *People v. Catlin* (2001) 26 Cal.4th 81, 138, fn. 14; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1044 [failure to object waives appellate review of alleged error based on *Bruton v. United States* (1968) 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d 518]; *People v. Chaney* (2007) 148 Cal.App.4th 772, 777-779.) As we will explain, we find defense counsel waived a Sixth Amendment objection in this case.FN6

> FN6. "Over the years, cases have used the word [waiver] loosely to describe two related, but distinct, concepts: (1) losing a right by failing to assert it, more precisely called forfeiture; and (2) intentionally relinquishing a known right. '[T]he terms "waiver" and "forfeiture" have long been used interchangeably. The United States Supreme Court recently observed, however: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' [Citations.]" (*United States v. Olano* [ ( 1993) 507 U.S. 725, 733 ... ].)' (*People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6....)" (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371.)

*Melendez-Diaz* itself specifically addressed the defendant's obligation to preserve review of confrontation clause issues, and held "[t]he defendant *always* has the burden of raising his Confrontation Clause objection...." (*Melendez-Diaz, supra,* 129 S.Ct. 2527, 2541, italics in original.) *Melendez-Diaz* further held that "[t]he right to confrontation may, of course, be waived, including by failure to object to the offending evidence...." (*Id.* at p. 2534, fn. 3.) "It is up to the prosecution to decide

what steps in the chain of custody are so crucial as to require evidence; but what testimony is introduced must ( if the defendant objects ) be introduced live." (*Id.* at p. 2532, fn. 1, first italics in original, second italics added.)

Defendant argues that his failure to object should be excused because *Geier* was the controlling precedent at the time of trial, and *Melendez-Diaz's* analysis of the Sixth Amendment could not have been anticipated. We note that *Crawford* was retroactively applied to cases which were pending on direct appeal when it was decided, because it repudiated *Roberts* and announced a new rule on the effect of the confrontation clause on hearsay statements. (See, e.g., *Schriro v. Summerlin* (2004) 542 U.S. 348, 351; *Griffith v. Kentucky* (1987) 479 U.S. 314, 328; *People v. Cage* (2007) 40 Cal.4th 965, 970; *People v. Sisavath* (2004) 118 Cal.App.4th 1396, 1400; cf. *Whorton v. Bockting* (2007) 549 U.S. 406, 409, 421 [*Crawford* not retroactive to cases on collateral review].) A defendant who failed to raise a Sixth Amendment trial objection prior to the decision in *Crawford* did not waive review of the issue on direct appeal, since the United States Supreme Court's opinion in *Roberts* was the "governing law at the time" and "afforded scant grounds for objection. [Citation.]" (*People v. Johnson* (2004) 121 Cal.App .4th 1409, 1411, fn. 2.)

Defendant's extension of this argument to *Melendez-Diaz*, however, lacks merit based on the Supreme Court's own characterization of its ruling. *Crawford* announced that *Roberts* had been overruled and the "sufficient indicia of reliability" test abandoned. *Davis* clarified aspects of *Crawford* and further defined "testimonial" hearsay. In contrast, *Melendez-Diaz* repeatedly emphasized its holding was not new, that it was "faithfully applying *Crawford* to the facts of this case," and rejected the dissent's assertion that it was "overruling 90 years of settled jurisprudence. It is the dissent that seeks to overturn precedent by resurrecting *Roberts* a mere five years after it was rejected in *Crawford*." (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2533.)

*Melendez-Diaz* specifically stated that its ruling "involves little more than the application of our holding" in *Crawford*. (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2533.) "[U]nder our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were

24

'witnesses' for purposes of the Sixth Amendment," and there was "little doubt that the documents at issue" fell within "the 'core class of testimonial statements'" described in *Crawford*. (*Id.* at p. 2532.)

We note that the dissent relies on *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*) to argue that defendant did not forfeit or waive review of the Sixth Amendment issue in this case, because defense counsel could not have foreseen the development of law in *Melendez-Diaz*, contrary to controlling authority at the time of trial. This argument is based upon the proposition that *Melendez-Diaz* overruled *Geier*. As we will explain, *post*, we respectfully disagree that *Geier* has been overruled. Moreover, the important principle discussed in *Sandoval* was relevant to the situation where a defendant failed to make a Sixth Amendment objection at trial, and *Crawford* was decided while the case was pending on appeal. In that case, a defendant's failure to object did not result in waiver of the Sixth Amendment issue on appeal since the United States Supreme Court's opinion in *Roberts* was the "governing law at the time" and "afforded scant grounds for objection. [Citation.]" (*People v. Johnson, supra*, 121 Cal.App.4th 1409, 1411, fn. 2.)

In the case before us, however, we cannot ignore the express language of *Melendez-Diaz*, as discussed *ante*, which repeatedly stated that its holding was not new, it was "faithfully applying *Crawford* to the facts of this case," and its ruling "involves little more than the application of our holding" in *Crawford*. (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2533.)

*Melendez-Diaz* thus leads to the conclusion that defendant's failure to raise a Sixth Amendment objection to Spencer's testimony and Kennedy's notes necessarily waived review of the confrontation clause issue in this case because, as we will discuss, *post*, the record strongly indicates defense counsel made a tactical decision on this point.

(Doc. 16-1, 4-7, 11-23; 2010 WL 612245, *2-*4, *6-*13.)

In addressing Petitioner's contention that trial counsel's failure to raise a Confrontation Clause objection was ineffective

25

assistance, the CCA analyzed the trial record in the context of whether or not Petitioner's trial counsel had made a tactical choice not to object, and whether there was a waiver of any Sixth Amendment objections, as follows:

### *Ineffective Assistance*

Defendant raises the alternative argument that counsel's failure to object constituted ineffective assistance of counsel. "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. William*s (1997) 16 Cal.4th 153, 214-215.)

"If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.] When, however, the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. To engage in such speculations would involve the reviewing court '"in the perilous process of second-guessing."' [Citation .] Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal. [Citation.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 557-558.) If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267; *People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.)

The failure to object is considered a matter of trial
tactics "as to which we will not exercise judicial
hindsight. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th
495, 520.) We defer to counsel's tactical decisions in
examining ineffective assistance claims and there is a
"strong presumption that counsel's conduct falls within
the wide range of reasonable professional assistance; that
is, the defendant must overcome the presumption that,
under the circumstances, the challenged action 'might be
considered sound trial strategy.' [Citation]." (*Strickland
v. Washington* (1984) 466 U.S. 668, 689; *People v. Lucas*
(1995) 12 Cal.4th 415, 436-437.) "'Reviewing courts will
reverse convictions on the ground of inadequate counsel
only if the record on appeal affirmatively discloses that
counsel had no rational tactical purpose for his act or
omission.' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th
929, 980.)

Defendant contends his defense counsel should have raised
a Sixth Amendment objection to Spencer's testimony and
Kennedy's report. At the time of defendant's trial in
January 2008, *Crawford* and *Davis* had been decided, and
*Geier* was the controlling authority in this state as to
the application of Crawford to laboratory test results.
However, *Geier* itself noted a division among state courts
as to the application of *Crawford* to scientific evidence.
(*Geier, supra*, 41 Cal.4th at pp. 604-607.) Moreover, a
petition for writ of certiorari in *Geier* was pending
before the United States Supreme Court at the time of
defendant's trial. (*Geier v. California, supra*, ---U.S. --
-- [129 S.Ct. 2856] [petition for writ of certiorari
denied Nov. 21, 2007].)

The entirety of the record demonstrates defense counsel
made a tactical decision not to raise a Sixth Amendment
objection to Spencer's testimony. In closing argument,
defense counsel framed the contested issue as whether
defendant knew about the presence and nature of the small
item in his pocket. Counsel had developed evidence to
support this theory, based upon the testimony of
defendant's girlfriend, that he just bought the pants from
a second-hand store, and he had not laundered or worn the
pants prior to that night. The defense theory was further
bolstered by defense counsel's vigorous cross-examination
of Officer Carruesco as to his search of defendant and
where he found the item. Carruesco reviewed his report and
conceded the substance might have been in the small coin

pocket of defendant's pants rather than the larger front pocket. Defense counsel also seized upon Carruesco's description of the substance as being as small as the eraser on the tip of the pencil. Carruesco's description was confirmed by the photograph of the item itself, which the prosecution introduced into evidence as part of Kennedy's report about the laboratory analysis, all without objection by defense counsel.

Defense counsel relied upon all of this evidence to make the reasonable argument that defendant did not know such a small item, which weighed less than 0.2 grams, was in the small coin pocket of pants he had just purchased from a second-hand store. While the prosecutor pointed to defendant's evasive driving as further evidence that he knew the PCP was in his pocket, defense counsel confronted this evidence, and asserted the circumstances of defendant's arrest supported the opposing inference that defendant did not know the substance was in his pocket. Defense counsel introduced evidence that the actual pursuit lasted about one minute and for one mile, defendant stopped at his own residence, two other people were in the vehicle, and defendant did not possess any drug paraphernalia. Counsel argued that if defendant was evading the officers because he knew about the PCP in his pocket, he had plenty of time to dispose of the item by tossing it from the car or giving it to one of his passengers. Instead, counsel argued a more reasonable explanation for defendant's alleged evasion of the officers was because he knew he was driving without a license. While defense counsel presented the jury with a tenable theory of the case, the trier of fact was entitled to and, in fact did, reject it.

Moreover, defense counsel did not initially concede the admissibility of Spencer's testimony and Kennedy's report. During Spencer's direct examination, the prosecutor asked introductory questions about the nature and circumstances of Kennedy's tests and the laboratory protocols, and then moved to introduce Kennedy's report into evidence. Defense counsel refused to submit the matter until she conducted cross-examination of Spencer. Counsel questioned Spencer about Kennedy's qualifications and whether Spencer supervised Kennedy's work and/or reviewed the results. Counsel apparently accepted Spencer's testimony and submitted the matter when the prosecutor again attempted to move Kennedy's report into evidence. Counsel's

submission of the matter effectively amounted to a
stipulation that the substance in defendant's pocket was
PCP. But counsel relied upon the criminalist's report to
further attack the accuracy of Officer Carruesco's
testimony, since Carruesco thought the substance was
methamphetamine whereas the test results showed it was
PCP.

The entirety of the record thus demonstrates that defense
counsel was not eager to focus the jury's attention on the
fact that defendant was found in possession of PCP, and
she made the tactical decision not to renew her objections
to Spencer's testimony or Kennedy's report. Indeed,
*Melendez-Diaz* acknowledged that defense attorneys
routinely make tactical decisions not to raise Sixth
Amendment objections to scientific evidence:

> "Defense attorneys and their clients will often
> stipulate to the nature of the substance in the
> ordinary drug case. It is unlikely that defense
> counsel will insist on live testimony whose
> effect will be merely to highlight rather than
> cast doubt upon the forensic analysis. Nor will
> defense attorneys want to antagonize the judge
> or jury by wasting their time with the
> appearance of a witness whose testimony defense
> counsel does not intend to rebut in any
> fashion.... Given these strategic
> considerations, and in light of the experience
> in those States that already provide the same or
> similar protections to defendants, there is
> little reason to believe that our decision today
> will commence the parade of horribles [the
> State] and the dissent predict." (*Melendez-Diaz*,
> *supra*, 129 S.Ct. at p. 2542.)

*Melendez-Diaz* further observed that it did not expect
defense attorneys "to refrain from zealous representation
of their clients. We simply do not expect defense
attorneys to believe that their clients' interests (or
their own) are furthered by objections to analysts'
reports whose conclusions counsel have no intention of
challenging."  (*Melendez-Diaz, supra*, 129 S.Ct. at p.
2542, fn. 13.)

*Melendez-Diaz's* comment upon reasonable defense tactics
anticipated exactly what happened in this case. Defense

counsel refused to stipulate to the prosecutor's initial attempt to introduce Kennedy's report. Instead, she questioned Spencer about the nature and circumstances of the tests performed by Kennedy, and made the reasonable tactical decision not to challenge the admissibility of the evidence to avoid focusing the jury's attention on the PCP found in defendant's pocket. Moreover, counsel conducted a vigorous defense and developed the theory that defendant did not know the item was in his pocket, based on cross-examination of the prosecution witnesses and the introduction of defense evidence. The dissent states we cannot speculate about defense counsel's tactical decisions and the record does not demonstrate she intentionally refrained from objecting to the introduction of this evidence. (Dis. opn. of Dawson, J. at p. 2.) We respectfully disagree given our review of the procedural history of this case.

We thus conclude defense counsel was not ineffective for failing to raise a Sixth Amendment objection to Spencer's testimony and Kennedy's report. Defense counsel made the tactical decision not to further challenge evidence that was not favorable to the defendant and proceeded with a theory supported by the evidence, that defendant did not know what was in the pockets of a pair of pants he just purchased from a thrift store.

(Doc. 16-1, 23-28; 2010 WL 612245, *13-*16.)

Finally, the state court addressed alternatively the merits of the Sixth Amendment contention:

### *Melendez-Diaz and Geier*

Finally, even if defense counsel's failure to object did not waive the Sixth Amendment issue, or counsel was ineffective for failing to object, we find counsel's omission was not prejudicial because *Melendez-Diaz* did not overrule *Geier*. There are important distinctions between the cases. FN7 *Geier* relied on *Davis* and held that an expert could testify about the results of DNA tests, even if that expert did not conduct the actual tests, without violating the defendant's Sixth Amendment rights. In doing so, *Geier* explained "the crucial point" in *Davis,* in determining whether evidence is testimonial, is "whether the statement represents the contemporaneous recordation

of observable events." (*Geier, supra*, 41 Cal.4th at p. 607.) *Geier* held the DNA report prepared in that case was admissible and not testimonial because it contained the analyst's observations as she actually performed the tests, and thus constituted "a contemporaneous recordation of observable events rather than the documentation of past events." (*Geier, supra*, 41 Cal.4th at p. 605.) In addition, the supervisor of the analyst who conducted the DNA tests and prepared the report testified in *Geier*, and was available for cross-examination as to the nature of the tests and review of the analyst's work. (*Geier, supra*, 41 Cal.4th at pp. 593-596.)

> FN7. We address defendant's Sixth Amendment argument assuming, without deciding, that *Melendez-Diaz* may be applied retroactively to this case.

In contrast, *Melendez-Diaz* held the defendant's Sixth Amendment rights were violated in that case because of the admission of "'certificates of analysis'" (*Melendez-Diaz, supra*, 129 S .Ct. at pp. 2530-2531) containing "only the bare-bones statement" that the contraband at issue consisted of cocaine. (*Id.* at p. 2536.) The certificates were "quite plainly affidavits" that fell "within the 'core class of testimonial statements'" subject to the Sixth Amendment restrictions described in *Crawford,* and were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' [Citation.]" (*Id.* at p. 2532.) No witness testified or was subject to cross-examination in *Melendez-Diaz* about any aspects of the tests conducted on the contraband, and there was absolutely no evidence introduced about "what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." (*Id.* at p. 2537.) These points were crucial in *Melendez-Diaz* because even though the laboratories purportedly used "'methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs,' ....[a]t least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination. [Citations.]" (*Id.* at pp. 2537-2538.) Moreover, *Melendez-Diaz* acknowledged *Davis's* distinction between contemporaneous and near-contemporaneous statements, and found it "doubtful" that the analyst's

reports in *Melendez-Diaz* "could be characterized as
reporting 'near-contemporaneous observations'" because the
affidavits "were completed almost a week after the tests
were performed. [Citation.]" (*Melendez-Diaz, supra*, 129
S.Ct. at p. 2535.) We believe these are crucial
distinctions in the court's analysis of testimonial
statements, and that *Melendez-Diaz* did not undermine
*Geier's* reliance on *Davis*.

The instant case is also distinguishable from *Melendez-
Diaz* because the prosecution's evidence as to the nature
of the substance found in defendant's pocket was not
introduced through a bare affidavit or certificate.
Instead, Spencer, the supervising criminalist, testified
at trial and was subject to cross-examination as to the
nature of Kennedy's tests. Spencer had personal knowledge
about the types of tests conducted on contraband, and
explained the laboratory's protocols for conducting such
tests. In contrast to *Melendez-Diaz*, Spencer extensively
testified as to the chain of custody of the substance
found in defendant's pocket, the type of tests performed,
and the steps involved in the testing process. She
conducted her own independent review of Kennedy's work as
part of her supervisorial duties, such that the defendant
was well-aware "what tests the analysts performed, whether
those tests were routine, and whether interpreting their
results required the exercise of judgment or the use of
skills that the analysts may not have possessed."
(*Melendez-Diaz, supra*, 129 S.Ct. at p. 2537.) In addition,
Spencer's testimony was based upon the notes compiled by
Kennedy as she conducted the tests, and were thus a
"contemporaneous recordation of observable events rather
than the documentation of past events." (*Geier, supra,* 41
Cal.4th at p. 605.

We also believe that to the extent that some aspects of
Justice Scalia's four-vote plurality opinion in *Melendez-
Diaz* may raise questions about the holding in *Geier*, it is
necessarily tempered by Justice Thomas's concurrence,
which supplied the necessary fifth vote. Justice Thomas's
concurring opinion in *Melendez-Diaz* was based upon his
concurring and dissenting opinion in *Davis,* and expressed
his limited view that testimonial evidence consisted of
extrajudicial statements "'only insofar as they are
contained in formalized testimonial materials, such as
affidavits, depositions, prior testimony, or confessions.'
[Citations.]" (*Melendez-Diaz, supra*, 129 S.Ct. at p. 2543

(conc. opn. of Thomas, J.).) In the face of a strong
dissent by four justices, Justice Thomas joined Justice
Scalia's opinion in *Melendez-Diaz* only because "the
documents at issue in this case 'are quite plainly
affidavits,'" and fell within " 'the core class of
testimonial statements' governed by the Confrontation
Clause. [Citation.]" (*Melendez-Diaz, supra*, 129 S.Ct. at
p. 2543 (conc. opn. of Thomas, J.).) Justice Thomas did
not join in the wide-ranging statements in Justice
Scalia's opinion that may appear to undermine *Geier*.
"When a fragmented Court decides a case and no single
rationale explaining the result enjoys the assent of five
Justices, 'the holding of the Court may be viewed as that
position taken by those Members who concurred in the
judgments on the narrowest grounds....' [Citation.]"
(*Marks v. United States* (1977) 430 U.S. 188, 193; see also
*Panetti v. Quarterman* (2007) 551 U.S. 930, 949; *Del Monte
v. Wilson* (1992) 1 Cal.4th 1009, 1023.) While the opinion
in *Melendez-Diaz* may not be "fragmented," Justice Thomas
supplied the "decisive" fifth vote and he concurred on
grounds narrower than those put forth by the plurality.
(See, e.g., *United States v. Brown* (5th Cir.2008) 553 F.3d
768, 783.) As a result, his position takes on heightened
significance in interpreting *Melendez-Diaz* and may be
considered controlling. (See, e.g., *Romano v. Oklahoma*
(1994) 512 U.S. 1, 9; *People v. Rios* (2009) 179
Cal.App.4th 491, 501-503; *Tily B., Inc. v. City of Newport
Beach* (1999) 69 Cal.App.4th 1, 16; *Blanco v. Baxter
Healthcare Corp.* (2008) 158 Cal.App.4th 1039, 1050, fn.
7.)

....[3]

We thus conclude that even if defense counsel did not
waive review of the Sixth Amendment issue, and counsel was
ineffective for failing to object, any error is not
prejudicial because *Melendez-Diaz* did not overrule *Geier*.

Doc. 16-1, 28-34; 2010 WL 612245, *16-*21.)

///

B.  <u>Procedural Default</u>

---

[3] The state court's discussion of <u>People v. Vargas</u>, 178 Cal.App.4th 647 (2009) is omitted.

33

Respondent argues that Petitioner's <u>Crawford</u> claim is barred because he failed to object to the admission of any forensic evidence at trial.

The doctrine of procedural default is a specific application of the more general doctrine of independent state grounds.  It provides that when state court decision on a claim rests on a prisoner's violation of either a state procedural rule that bars adjudication of the case on the merits or a state substantive rule that is dispositive of the case, and the state law ground is independent of the federal question and adequate to support the judgment such that direct review in the United States Supreme Court would be barred, then the prisoner may not raise the claim in federal habeas absent a showing of cause and prejudice or that a failure to consider the claim will result in a fundamental miscarriage of justice.  <u>Walker v. Martin</u>, - U.S. -, 131 S.Ct. 1120, 1127 (2011); <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991); <u>Bennett v. Mueller</u>, 322 F.3d 573, 580 (9th Cir. 2003); <u>Wells v. Maass</u>, 28 F.3d 1005, 1008 (9th Cir. 1994).  The doctrine applies regardless of whether the default occurred at trial, on appeal, or on state collateral review.  <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000).

Because state procedural default is an affirmative defense, the state bears the ultimate burden of persuasion as to the adequacy and independence of the pertinent rule.  <u>Bennett v. Mueller</u>, 322 F.3d at 585-86.  However, once the state adequately pleads the existence of

34

an independent and adequate state procedural ground as an affirmative defense, the burden to place the defense in issue shifts to the petitioner, who may satisfy the burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule.  Id. at 586.  Once the petitioner has done so, the ultimate burden of proof of the defense is on the state.  Id. at 586.

Where a state court discusses a state procedural bar as a separate basis for its decision but then, in an alternative holding, discusses the merits of the federal claim, the court has clearly and expressly stated its reliance on a procedural ground, and the procedural bar applies.  Bennett v. Mueller, 322 F.3d at 580; Carriger v. Lewis, 971 F.2d 329, 333 (9th Cir. 1992) (citing Coleman v. Thompson, 501 U.S. 722 and Harris v. Reed, 489 U.S. at 264 n.10).

Here, the last state court to issue a reasoned decision on the issue of waiver or forfeiture of Petitioner's confrontation claim expressly found that 1) Petitioner's Sixth Amendment claim was waived by counsel's failure to object, and 2) Petitioner's counsel had made a tactical decision after cross-examination not to object to the criminalist's testimony or documentation and thus not to preserve the issue.  The court thus clearly and expressly relied on the Petitioner's failure to make a contemporaneous objection to the evidence.

35

It has long been recognized in this circuit that California's contemporaneous objection rule is adequate to support the judgment where a party has failed to make any objection to the admission of evidence.  See, Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) (citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981), in which it was held that the failure to object to a photographic identification during trial would bar review of a claim).  Further, a Confrontation Clause claim is barred where a petitioner fails to object at trial to the admission of the evidence alleged to have violated the right to confrontation.  Davis v. Woodford, 384 F.3d 628, 654 (9th Cir. 2004).

Here, Petitioner's claim concerning a violation of the Confrontation Clause is barred by the state court's reliance on the adequate and independent state ground of failure to lodge a contemporaneous objection.

If the respondent has asserted the procedural default doctrine in a timely and proper fashion, and if the default provides an independent and adequate state procedural ground for decision, the petitioner is barred from raising the defaulted claims unless the petitioner can 1) excuse the default by demonstrating cause for the default and actual prejudice as a result, or 2) show that the case comes within the category of cases the Supreme Court has characterized as fundamental miscarriages of justice.  Coleman v. Thompson, 501 U.S. at 722.  Cause is a legitimate excuse for the

default.  Thomas v. Lewis, 945 F.2d 1119, 1123 (9th Cir. 1991).  A demonstration of cause generally means that the petitioner must show that some objective factor external to the defense impeded efforts to construct or raise a claim, such as a showing that the factual or legal basis for a claim was not reasonably available, counsel was ineffective in failing to preserve a claim, or some interference by officials made compliance impracticable.  Coleman v. Thompson, 501 U.S. at 753 (citing Murray v. Carrier, 477 U.S. 478, 488, 492 (1986)).

Here, Petitioner has not alleged any facts that would support a conclusion that there was any objective factor external to the defense that impeded efforts to construct or raise a claim.  With respect to Petitioner's allegations concerning his trial counsel's ineffective assistance, the Court's analysis of Petitioner's separate claim concerning the allegedly ineffective assistance in violation of the Sixth and Fourteenth Amendments, set forth below, will explain that Petitioner has failed to show any ineffective assistance of counsel.  Petitioner has not shown any cause.

Further, Petitioner has not presented any basis for a finding of a miscarriage of justice.

It is concluded that Petitioner's Confrontation Clause claim was procedurally defaulted and thus will not be reviewed in this proceeding.

V.   Ineffective Assistance of Counsel

Petitioner argues that his trial counsel's failure to object to the admission of the lab report and data violated his right to the

effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments.  The state court decision concerning this claim has been previously set forth.

The law governing claims concerning ineffective assistance of counsel is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  <u>Premo v. Moore</u>, --U.S. --, 131 S.Ct. 733, 737-38 (2011); <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

The very demanding standard of review in a proceeding pursuant to § 2254 of claims involving allegedly ineffective assistance of counsel has recently been summarized by the United States Supreme Court:

> "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [<u>Strickland</u>,] 466 U.S., at 688 [104 S.Ct. 2052]. A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. <u>Id.</u>, at 689 [104 S.Ct. 2052]. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' <u>Id.</u>, at 687 [104 S.Ct. 2052].

> "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ...

> " 'Surmounting <u>Strickland's</u> high bar is never an easy task.' <u>Padilla v. Kentucky</u>, 559 U.S. ----, ---- [130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the <u>Strickland</u> standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.

Strickland, 466 U.S., at 689-690 [104 S.Ct. 2052]. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689 [104 S.Ct. 2052]; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at ----, 129 S.Ct., at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

Premo v. Moore, 131 S.Ct. at 739-40 (quoting Harrington v. Richter, 131 S.Ct. 770).

Here, although defense counsel did not stipulate to the admission of the laboratory notes and report, counsel did not object; rather, counsel and the prosecutor examined Spencer.  It was ascertained that there was abundant material remaining to be tested. Spencer was examined regarding not only the qualifications and

experience of Kennedy, the criminalist who performed and documented the tests that were the subject of the laboratory report and notes, but also the foundation of the testimony of Spencer, who supervised Kennedy, reviewed all the data recorded by Kennedy, and concluded that the documented data and procedures indicated the presence of PCP and were in conformity with the laboratory's policies and procedures.  In argument, counsel made use of Spencer's testimony concerning the size of the material found in Petitioner's possession, the presence of a usable amount, and the standard of, or method for determining, whether an amount was usable.

Based on the evidence before the state court, the state court reasonably found that counsel made a rational tactical decision based on evidence admitted at trial not to object to the criminalist's evidence, but rather to use it in the course of mounting a tenable defense of absence of knowledge of the presence or nature of the controlled substance based on the small size of the material found and its location in a very small pocket of pants that the evidence showed had been recently acquired at a second-hand store.  Counsel argued the defense to the jury and did not address the criminalist's tests.  The parties have not brought to the attention of the Court any evidence in the record that provides or suggests a basis for a substantive challenge to the propriety of Kennedy's testing or Spencer's review of the lab report and notes. There is no showing in the record as to Kennedy's ultimate

availability to testify had an objection been lodged to the
evidence.  The Court in Melendez-Diaz expressly acknowledged the
practice of defense attorneys to make tactical decisions even to
stipulate to the nature of the substance where there is no intention
to rebut any testimony that an analyst would give.  Melendez-Diaz,
129 S.Ct. at 2542.

It is concluded that in the present case, Petitioner has not
met his burden of showing that counsel's tactical decision was
unreasonable or prejudicial or that the state court's implicit
conclusions in that regard were contrary to, or an unreasonable
application of, clearly established federal law within the meaning
of § 2254(d)(1).

Accordingly, Petitioner's claim concerning the ineffective
assistance of counsel should be denied.

VI.  Cruel and Unusual Punishment

Petitioner argues that his sentence of twenty-five years to
life for possession of PCP constitutes cruel and unusual punishment
in violation of his rights under the Eighth and Fourteenth
Amendments.

A.  Factual Summary

The CCA summarized Petitioner's criminal history as follows:

At the sentencing hearing, the court considered
defendant's post-trial request to dismiss one or both
prior strike convictions, and extensively reviewed his
criminal history as set forth in the probation report. In
1993, defendant was convicted in Santa Clara County of the

41

two prior strike convictions, second degree robbery and
kidnapping, and sentenced to three years in prison. In
March 1995, he was released on parole. In January 1999, he
violated parole. In February 1999, he was again released
on parole. In March 1999, he was discharged from parole.

Defendant also suffered numerous misdemeanor convictions
in Kern County. In 1997, defendant was convicted of
possession of narcotics paraphernalia (Health & Saf.Code,
§ 11364) and willful violation of a promise to appear
(Pen.Code, § 853.7). He was placed on misdemeanor
probation for three years and ordered to serve 60 days in
jail. In 1999, defendant was convicted of driving under
the influence (Veh.Code, § 23152, subd. (a)) and driving
on a suspended or revoked license (Veh.Code, § 14601.1,
subd. (a)), and placed on misdemeanor probation for three
years and ordered to serve 60 days in jail.

In June 2000, defendant was convicted of driving on a
suspended or revoked license and unlawfully driving or
taking a vehicle (§ 10851, subd. (a)), and placed on
misdemeanor probation for three years and service of jail
time. In September 2000, he violated probation because he
failed to install an ignition interlock device in his
vehicle. In December 2001, he was reinstated on probation
with five days in jail.

In December 2001, defendant was convicted of misdemeanor
possession of less than 28.5 grams of marijuana (Health &
Saf.Code, § 11357, subd. (b)) and sentenced to five days
in jail. In April 2002, he was convicted of driving on a
suspended or revoked license and willfully violating his
promise to appear (§ 40508, subd. (a)), placed on
misdemeanor probation for three years, and ordered to
serve 20 days in jail. In June 2002, he violated probation
by failing to appear, and probation was reinstated with 20
days in jail. In August 2002, he again violated probation
by failing to appear, and probation was again reinstated
with 20 days in jail.

In June 2002, defendant was convicted of driving on a
suspended or revoked license and operating a vehicle
without a functioning interlock ignition device while his
driving privilege was restricted (§ 23247, subd. (e)). He
was placed on misdemeanor probation for three years and
ordered to serve 40 days in jail. In August 2002, he
violated probation by failing to appear, probation was

42

reinstated, and he was ordered to serve 40 days in jail.

In December 2002, December 2003, and November 2004, defendant was charged with separate violations of driving on a suspended or revoked license. In March 2006, he was placed on misdemeanor probation and ordered to serve 45 days in jail. In May 2006, he violated probation by failing to appear and probation was reinstated. In April 2006, he was charged in Tulare County with driving on a suspended or revoked license, and a bench warrant was issued. Defendant was not on misdemeanor probation at the time he committed the instant offenses, but he had failed to appear in three misdemeanor cases "all relating to driving with a suspended license which took place over a two year period of time between 2002 and 2004." Defendant admitted to the probation officer that he previously drank alcohol and used marijuana, methamphetamine, and PCP, but said he had not used those substances for five years prior to his arrest.

The trial court herein declined to dismiss one or both prior strike convictions and found that "following his two strike convictions in 1993, there has been no significant period of time where the defendant has led a crime-free life."

(Doc. 16-1, 35-37; 2010 WL 612245, *21-*22.)

    B. The State Court Decision

  The CSC summarily denied Petitioner's petition for review; thus, the last reasoned decision of a state court was the decision of the CCA, which was in pertinent part as follows:

**III. Cruel and/or Unusual Punishment**

Defendant renews the argument which was raised and rejected at the sentencing hearing, that the imposition of an indeterminate third strike term of 25 years to life for the felony offense of possession of a controlled substance constitutes cruel and/or unusual punishment in violation of the United States and California Constitutions.

The purpose of the Three Strikes law is not to subject a criminal defendant to a life sentence merely on the basis

43

of the latest offense. Rather, the purpose is to punish recidivist behavior. (*People v. Diaz* (1996) 41 Cal.App.4th 1424, 1431; *People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1630-1631.) Habitual offender statutes have withstood constitutional scrutiny based on assertions of cruel and unusual punishment, as well as claims of a disproportionate sentence. (See *People v. Ayon* (1996) 46 Cal.App.4th 385, 398-400, overruled on other grounds in *People v. Deloza* (1998) 18 Cal.4th 585, 593-595, 600.)

Defendant argues that aside from his two prior strikes, his criminal record and the instant offenses involved nonviolent and victimless crimes. However, "society's interest in deterring criminal conduct or punishing criminals is not always determined by the presence or absence of violence. [Citations.] [Defendant's] intractable recidivism, coupled with his current offense[s], justify the term imposed." (*People v. Cooper* (1996) 43 Cal.App.4th 815, 826.) Moreover, defendant is being punished not merely for the current offense but also because of his recidivism. (*People v. Romero* (2002) 99 Cal.App.4th 1418, 1432.) In evaluating the factors set forth in *In re Lynch* (1972) 8 Cal.3d 410, defendant's sentence is not so disproportionate to the crime that it shocks the conscience, and it does not violate the state constitutional prohibition against cruel or unusual punishment. (See *People v. Stone* (1999) 75 Cal.App.4th 707, 715; *People v.. Martinez* (1999) 71 Cal.App.4th 1502, 1510-1517; *People v. Cooper, supra*, 43 Cal.App.4th 815, 825-828; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1337-1338.)

In addition, defendant cannot demonstrate that his sentence violates the prohibition against cruel and unusual punishment contained in the federal Constitution. (*Lockyer v. Andrade* (2003) 538 U.S. 63, 66-67, 77 (*Andrade*); *Ewing v. California* (2003) 538 U.S. 11, 29-31 (*Ewing*); *People v. Cooper, supra*, 43 Cal.App.4th at pp. 820-825.) In *Ewing*, the United States Supreme Court held that the cruel and unusual punishment clause of the federal Constitution contains a narrow proportionality principle that prohibits grossly disproportionate sentences. (*Ewing, supra*, 538 U.S. at p. 23.) The court upheld a 25-year-to-life sentence under the Three Strikes law for a defendant with prior burglary and robbery convictions who shoplifted three golf clubs. (*Id.* at pp. 17-18, 29-31; see also *Andrade, supra*, 538 U.S. at pp. 66-

44

68, 77 [two consecutive terms of 25 years to life under Three Strikes law for thefts of videotapes not grossly disproportionate].)

Defendant contends his situation is similar to that addressed in *People v. Carmony* (2005) 127 Cal.App.4th 1066, where the court found a third strike sentence of 25 years to life imposed for the defendant's failure to reregister as a sex offender violated both the federal and state constitutional prohibitions against cruel and/or unusual punishment. In doing so, the court emphasized that defendant had in fact registered, and his failure to reregister was a purely technical violation with no practical effect. (*Id.* at p. 1078.) "Here, there was no new information to update and the state was aware of that fact. Accordingly, the requirement that defendant reregister within five days of his birthday served no stated or rational purpose of the registration law and posed no danger or harm to anyone." (*Id.* at p. 1073.) "Because a 25-year recidivist sentence imposed solely for failure to provide duplicate information is grossly disproportionate to the offense, shocks the conscience of the court and offends notions of human dignity, it constitutes cruel and unusual punishment under both the state and federal Constitutions." (*Ibid.*) The court specifically declined to consider "the appropriateness of a recidivist penalty when the predicate offense does not involve a duplicate registration." (*Id.* at p. 1073, fn. 3.)

In contrast to *People v. Carmony, supra*, 127 Cal.App.4th 1066, defendant's convictions in the instant case were not technical violations of the law that "served no stated or rational purpose." (*Id.* at p. 1073.) Defendant's case is clearly within the parameters set by *Ewing* and *Andrade*. As in those cases, "[i]f terms of 25 years to life and 50 years to life are not '"grossly disproportionate"' for petty theft with prior felony convictions," then the indeterminate term imposed here is not grossly disproportionate to the offense of possession of a controlled substance, given defendant's criminal history, including the prior strike convictions, numerous periods of incarceration in county jails, and repeated failures to appear and probation violations. (*People v. Em* (2009) 171 Cal.App.4th 964, 977; see *Andrade, supra*, 538 U.S. at p. 77; *Ewing, supra*, 538 U.S. at pp. 28-30; *People v. Romero, supra*, 99 Cal.App.4th at pp. 1432-1433.)

45

(Doc. 16-1, 40-43; 2010 WL 612245, *24-*26.)

       C.   Analysis,

    A criminal sentence that is "grossly disproportionate" to the crime for which a defendant is convicted may violate the Eighth Amendment. Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring); Rummel v. Estelle, 445 U.S. 263, 271 (1980). Outside of the capital punishment context, the Eighth Amendment prohibits only sentences that are extreme and grossly disproportionate to the crime. United States v. Bland, 961 F.2d 123, 129 (9th Cir. 1992) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001, (1991) (Kennedy, J., concurring)). Such instances are "exceedingly rare" and occur in only "extreme" cases. Lockyer v. Andrade, 538 U.S. at 72 73; Rummel, 445 U.S. at 272. So long as a sentence does not exceed statutory maximums, it will not be considered cruel and unusual punishment under the Eighth Amendment. See United States v. Mejia Mesa, 153 F.3d 925, 930 (9th Cir. 1998); United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).

    The decisions of the Supreme Court confirm that the Eighth Amendment does not disturb the authority of a state to protect the public by adopting a sentencing scheme that imposes longer sentences on recidivists who have suffered a serious prior felony conviction. Ewing v. California, 538 U.S. 11, 25 (2003) (upholding a sentence of

twenty-five years to life for a recidivist convicted of grand theft); Lockyer v. Andrade, 538 U.S. 63, 66-67, 73-76 (2003) (upholding two consecutive terms of twenty-five years to life and denying habeas relief to an offender convicted of theft of videotapes worth approximately $150 with prior offenses that included first-degree burglary, transportation of marijuana, and escape from prison); Rummel, 445 U.S. at 284 85 (upholding a sentence of life with the possibility of parole for a recidivist convicted of fraudulently using a credit card for $80, passing a forged check for $28.36, and obtaining $120.75 under false pretenses); see Taylor v. Lewis, 460 F.3d 1093, 1101-02 (9th Cir. 2006) (upholding a sentence of twenty-five years to life for possession of .036 grams of cocaine base where the petitioner had served multiple prior prison terms with prior convictions of offenses that involved violence and crimes against the person). Likewise, the Court has affirmed severe sentences for controlled substance violations. See Harmelin v. Michigan, 501 U.S. at 962-64 (1990) (upholding a sentence of life without the possibility of parole for a defendant convicted of possessing more than 650 grams of cocaine, although it was his first felony offense).

Here, the state court articulated the correct legal standards and reasonably concluded that in light of the limited range of disproportionate sentences recognized as Eighth Amendment violations under Supreme Court authority, and considering Petitioner's prior

47

convictions of robbery and kidnaping and repeated failures on probation and parole, Petitioner's sentence was not disproportionate and did not offend the Eighth and Fourteenth Amendments.

Accordingly, it will be recommended that Petitioner's claim of cruel and unusual punishment be denied.

VII.   Denial of Petitioner's Motion to Strike Prior Convictions

Petitioner argues that the trial court abused its discretion when it denied Petitioner's motion to strike prior convictions.  He also argues that the ruling violated his right to due process of law under the Fourteenth Amendment.

A.   Abuse of Discretion under State Law

Federal habeas relief is available to state prisoners only to correct violations of the United States Constitution, federal laws, or treaties of the United States.  28 U.S.C. § 2254(a).  Federal habeas relief is not available to retry a state issue that does not rise to the level of a federal constitutional violation.  Wilson v. Corcoran, 562 U.S. — , 131 S.Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Alleged errors in the application of state law are not cognizable in federal habeas corpus.  Souch v. Schaivo, 289 F.3d 616, 623 (9th Cir. 2002).  The Court accepts a state court's interpretation of state law.  Langford v. Day, 110 F.3d 1180, 1389 (9th Cir. 1996).  In a habeas corpus proceeding, this Court is bound by the California Supreme Court's interpretation of California law unless it is determined that the interpretation is untenable or a veiled attempt to avoid review of federal questions.  Murtishaw v. Woodford, 255 F.3d 926, 964 (9th Cir. 2001).

Here, there is no indication that the state court's interpretation of state law was associated with an attempt to avoid review of federal questions. Thus, this Court is bound by the state court's interpretation and application of state law.

The decision of the CCA was the last reasoned decision on Petitioner's claim concerning the ruling on the motion to strike prior convictions. It is not necessary to quote the decision at length here because the state court's decision addressed the sole issue of whether under state law the sentencing court abused its discretion when it denied Petitioner's motion to strike his two prior serious and violent felony convictions of second degree robbery and kidnapping, which had both been committed in 1993. The CCA relied solely upon state law in determining that the sentencing court had fully considered the factors that were relevant under state statutes and decisions and had reasonably concluded that there was no significant period of time in which the Petitioner had led a crime-free life; his two serious and violent felonies had been followed by a string of less serious offenses over a long period of time, evincing a lengthy and continuous criminal history that did not mitigate Petitioner's early offenses or take Petitioner outside the state's recidivist sentencing scheme. The CCA concluded that the sentencing court had made a decision that was not irrational or arbitrary, but rather was intended to achieve legitimate sentencing objectives. (Doc. 16-1, 34-40.)

This Court cannot review in this proceeding the state court's interpretation or application of Cal. Pen. Code § 1385, the state statute that grants California sentencing courts the authority to dismiss a prior conviction in the interests of justice. A claim

49

alleging misapplication of state sentencing law involves a question of state law which is not cognizable in a proceeding pursuant to 28 U.S.C. § 2254.  See, Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (rejecting a claim that a state court misapplied state statutes concerning aggravating circumstances on the ground that federal habeas corpus relief does not lie for errors of state law); Souch v. Schaivo, 289 F.3d 616, 623 (9th Cir. 2002) (dismissing as not cognizable claims alleging only that the trial court abused its discretion in selecting consecutive sentences and erred in failing to state reasons for choosing consecutive terms); Miller v. Vasquez, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (dismissing as not cognizable a claim concerning whether a prior conviction qualified as a sentence enhancement under state law); Brown v. Mayle, 283 F.3d 1019, 1040 (9th Cir. 2002), vacated on other grounds, Mayle v. Brown, 538 U.S. 901 (2003) (dismissing as not cognizable a claim that a petitioner should be resentenced after consideration of a motion to strike a prior conviction).

Accordingly, insofar as Petitioner raises a claim concerning an abuse of discretion under state law, Petitioner's claim should be dismissed because it is not cognizable in a proceeding pursuant to 28 U.S.C. § 2254.

B.  Due Process

Petitioner does not explain the basis of his claim that the ruling on the motion to strike violated his right to due process of law.

Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal

50

habeas relief.  Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994).  Petitioner has not shown any fundamental unfairness.

Petitioner cites Hicks v. Oklahoma, 447 U.S. 343, 346 (1980), in which the Court found that a defendant's sentence was imposed in violation of the Due Process Clause of the Fourteenth Amendment, which protects against arbitrary deprivation of liberty by the state.  There the jury, which was given the discretion under state law to impose punishment, was instructed under a habitual offender statute, later declared to be unconstitutional, to sentence the Petitioner to a mandatory forty years.  Had the jury been properly instructed, the jury could have imposed any sentence of not less than ten years.  The Court reasoned that the defendant's interest in the exercise of a jury's discretion as to a penalty that was created by state law was not merely a matter of state procedural law because the defendant had a "substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion," and that the "liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State."  Id. at 346.  The Court concluded that the petitioner was denied his right to the jury's judgment.  The Court characterized the state appellate court's determination that a jury might have imposed a sentence equally as harsh as that mandated by the invalidated habitual offender statute as "frail conjecture" as to what a jury might have done, and an arbitrary disregard of the defendant's right to liberty.  Id. at 345-46.

Here, as in Hicks, state law provided a specific method for determining whether a prior conviction should be stricken.

51

Petitioner was entitled under state law to have his prior convictions considered according to the pertinent state statutes in light of the specific findings made by the trial court in relation to those statutes.  Petitioner does not claim that any of those statutes has been invalidated.  The record reflects that the sentencing court considered the statutory criteria and came to a determination based on the pertinent law and Petitioner's particularized circumstances.  Petitioner was thus not deprived of any statutory entitlement.

To the extent that Petitioner's due process argument might rest upon an assertion that he has a liberty interest that was violated by the state court's abuse of discretion, the source of any liberty interest would be state law.  However, here the state court has definitively determined that there was no abuse of discretion after affording Petitioner due process and considering the pertinent factors.  Thus, Petitioner has not shown that there was a violation of any protected liberty interest.

In summary, the Court concludes that Petitioner has not shown that the state court's decision or decision-making process violated Petitioner's right to due process or that it was contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, Petitioner's due process claim should be denied.

VIII.  <u>Certificate of Appealability</u>

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.  28

U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003).  A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Rule 11(a) of the Rules Governing Section 2254 Cases.

A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right. § 2253(c)(2).  Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336 (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether: (1) the petition states a valid claim of the denial of a constitutional right, and (2) the district court was correct in any procedural ruling.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong.  <u>Id.</u>  An applicant must show more than an absence of frivolity or the existence of mere good faith; however, the applicant need not show that the appeal will succeed.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner.  Petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, it will be recommended that the Court decline to

issue a certificate of appealability.

     IX.   Recommendations

     Accordingly, it is RECOMMENDED that:

     1) The petition for writ of habeas corpus be DISMISSED insofar as it raises state law claims and DENIED insofar as it raises federal claims; and

     2) Judgment be ENTERED for Respondent; and

     3) The Court DECLINE to issue a certificate of appealability.

     These findings and recommendations are submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __**April 2, 2014**__              ___/s/ *Barbara A. McAuliffe*___
                                         UNITED STATES MAGISTRATE JUDGE